The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit, Oyez, Oyez, Oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the 4th Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, be seated, please. First case we'll hear this morning is Mission Integrated Technologies v. Clemente, and Mr. Mills, we'll hear from you first. May it please the Court. Lauren Mills on behalf of Mission Integrated Technologies, which I will call MIT. This case concerns a business conspiracy between a father and son to, in the words of the son, shaft the majority owner of MIT into giving him a 10% stake in the company. Why don't you pull the microphone right in front of you. Thank you. Thank you. I brought a visual aid because the fundamental issue on appeal in this case. Bring some binoculars for it. Excuse me? Bring some binoculars to see that. I'll do my best to illustrate it. You know, we allowed you to do that. We didn't add the notion that they almost are never useful because we can't read it from here, number one. You have provided it to us on paper, and we can see that. But we've allowed you to have it there, and it's a nice decoration, but I can tell you we can't read it. Thank you. Well, I'd like to focus on the fundamental issue on appeal in this case, the statute of limitations. And the court erred for one reason. It didn't even say what choice of law it was using for the statute of limitations on the contract issue. And for that reason alone, it's reversible. But here's the timeline that will help you appreciate the statute of limitation on the other issues. Nothing for statute of limitations purposes before 2017 matters. That's because between 2013 and 2017, all the information relates to the development of the Ares I, which was a commercial failure. In 2017, the Ares II was redeveloped, a company called Cardinal Scientific was hired. And which one of the issues are you talking about? Because it, as I looked at it, it looks like each one of these claims, the analysis of whether the statute of limitation applies depends on the particular facts of that claim as well as the applicable statute of limitations. That's exactly right. So, but you are speaking more generally, saying the statute of limitation, nothing mattered before the end here. And I'm not sure that applies to all of them or doesn't. I think it does, Your Honor. And let me explain why. And I'll go through as I hit each row on the day why that's important. Cardinal Scientific is hired in 2017. It develops a prototype at great expense. That prototype is demonstrated in Waldorf, Maryland to a delegation from the United Arab Emirates. A week later, Timothy Clementi, who is the president of MIT and the father of Josh Clementi, secretly files a provisional patent application in his name and in his son's name. He does not tell the majority owner of MIT anything about this or anybody else. During the- What claim are you talking about? I'm right with Judge Winn. I think it's much better, if you're talking about the fiduciary duty claim, which has, they have different limitation periods. For instance, the conspiracy to file the patent claim, the patent has been invalidated, so all the patent claims seem to be somewhat moot, it seems to me. But you do have a fiduciary duty claim, you have a fraud claim, and I think it'd be much more helpful to us if you could start with a claim you're talking about and address the limitations with respect to any given claim that you think is appropriate. I'll start with the business conspiracy claim, Your Honor, because I think that's the easiest. Well, the business conspiracy, the object was to file the patents, right? The object was to usurp the intellectual property rights of MIT. I understand, filing the patents. The object, it was the patent, filing the patent secretly. Correct, Your Honor. Okay, but the patent has been invalidated, so what's the- It was invalidated at great expense to MIT when they asserted against it, he had to spend hundreds of thousands of dollars to invalidate 16 out of 17 claims of the patent. He incurred significant damages, and it interfered with the business for years until that patent was invalidated. It's serious damage. Why was it invalidated? Because it was on sale to the UAE in 2017, and so it violated the on sale and prior publication bar under the Patent Act. That's why it was invalidated. Well, you've got to have an underlying tort, what's the underlying tort? The underlying tort, there's fraudulent concealment, and there's intentional interference with contractual duties. Is that what you put in your complaint? Yes. Well, I thought the complaint alleged the underlying tort was a misappropriation of trade secrets. No, no, no, we were very clear in the counsel, there's multiple acts within the business conspiracy timeframe, and the issue under Virginia law- As I recall you, when this was addressed below, and you were asked, you referred to your count five as the underlying tort in the proceedings before the district court. I think it was fraud. Yes, that's the fraud count. If you look at the fraud count, it talks about, it looks to me, correct me if I'm wrong, activities going back even to 2013 when, is it Josh? Is Josh received confidential information under, I think the claim is, the belief that he had signed a nondisclosure agreement. My point there is that that goes back a long ways. As you described the underlying tort to the district court, not you, your party, maybe you. I'm not even criticizing. I'm just saying I think that's what you said. Right, right. Each independent act restarts the clock under the business conspiracy statute, and the key independent act here is November 2018 when Josh Clemente files a patent in his own name with the help of his father, who has fiduciary duties. He's the president of MIT, he's a member of MIT, and Josh induces him to breach those fiduciary duties to assist him in filing the patent, and that's an independent wrongful act, and the way the case law teaches it's wrongful or tortious, wrongful act right there on behalf of both of them, and that's within the five years. What was the wrongful act, breach of fiduciary duty? Excuse me, I'll interrupt. Was the wrongful act the breach of fiduciary duty? It's multiple. It's the breach of fiduciary duty and it's the interference with the contractual relationship by Josh. By the contractual relationship, which one are you talking about? Josh didn't sign anything. That's disputed. Well, if you want to address that, we can go into that. There's a little email that says the disclosure agreement was sent to Josh to be signed, and that's the total evidence. No, it's not, your honor. There's an agreement in 2022 signed by Timothy Clemente where he says that Josh signed the agreement. And then in 2024, summary judgment, he... Well, how does that create an agreement? A non-party to agreement says somebody else signed an agreement? He didn't say he saw it. As a matter of fact, he denied he saw it. That's not... And the son, Josh, said he didn't sign it. The first time Josh Clemente said he didn't sign it was 2022. Where is your evidence that a contract was actually signed? I mean, the fact that Tim says so? Yes, your honor. Well, he didn't say he had personal knowledge of that. He said he sent it to him to sign. His testimony was that he couldn't locate the contract, but that he always believed his son had signed it. He believed because he sent it to him to be signed, and he assumed that happened, but that's not... His roommate, Wes Reginball, at the time, had signed the agreement, and it was never denied. The first time it was denied was in 2022, and Tim signed a sworn affidavit that Josh was under an NDA. And it wasn't until 2024 that Tim changed his tune in a summary judgment affidavit that there was no contract. So it's clearly a disputed fact. I think that would change the whole business of everything we know about contract law. If a company can simply say that one of our office believes that someone signed an agreement, I don't know of a case we've ever held that says that's enough to say we're going to enforce a contract, or do you? I think he's saying... Come on, give me a case on that. There's... In the insurance coverage, there's millions of... Give me one case. I don't have one off the top of my head. Come back. Come back. That one case tells me all they had was an officer who said, I believe he signed it. In the insurance... And that's enough to say that's a contract. Don't even know what it is, because I don't... Where is it? I mean, I don't see it in documents. So you don't have that, so you're going on basically, I guess it's some form of hearsay or some kind of outside evidence. It's like the missing policies cases and insurance coverage cases, where the environmental towards the policies goes back decades. Totally different. They're both contracts.  And the issue... Policy is more of a standard type thing, that that's what insurance companies do and stuff like that. There's some evidence they had something from the inception. You don't have no evidence there was ever anything received by this company, asked for multiple times for up to five years, never got anything, and the best you have is he believed it was... Someone believes, one of the defendants believes it was signed. Well, and he was told by the president of the company for years that it was signed and just could not be located. And that's our evidence. I'm not arguing. That's what we have on this. Now, for the business conspiracy, this date is an independent wrongful act. It's clearly within the five years. Well, I can't read that. What conduct? November 20th, 2018. No, but what conduct? It's the filing of the provisional patent application in Josh Clemente's name only. It's an independent wrongful act. Now, the issue is that the statute doesn't even start to run until the injury is felt. So I'm still having a little trouble with the focus on that conduct. So help me with this, if you could. If conspiracy requires an underlying tort, and you've indicated to the district court that that underlying tort is your count five fraud claim, and your count five fraud claim talks about the disclosure of information to Josh when he didn't sign, under the assumption that he had signed an NDA when he hadn't, and that's how I read the complaint and your representations to the district court, and now it seems like we're moving to a different conduct. I don't think so, Your Honor. If you read our count three, it's never changed. I'm talking about . . . fair enough. Maybe my memory of the proceedings below are wrong, and that could be the But I thought you pointed to count five as your underlying tort. No, no. Count three, we've always focused on November 18 in count three. You're saying you didn't tell the district court that the underlying tort for count three is your fraud claim? No, and I wouldn't have said that because that's not the law. The law is wrongful act or underlying tort. It's two. Finally, a patent's not a wrongful act. It is if you're encouraging your father, who has fiduciary duties, to go along with you in the conspiracy to shake down the owner of the company. That's not the filing of the patent. That was just . . . the filing of the patent was just an act. I mean, it's a legal act. It is. He had authority to file it on behalf of, vis-a-vis the patent office, didn't he? He can file it, but he can't coerce his father into helping him and then keeping . . . He was an officer of the company. He was a partner. Whatever . . . Timothy was. Josh was not. Josh is inducing his father to breach his fiduciary duties. I thought you said it was the filing of the patent by the two of them. Well, no. It's filed in Josh's name only. It's filed in Josh's name only. There's an earlier patent filed in both names that is abandoned, becomes irrelevant. The only thing that's relevant is that Timothy Clementi takes the information from that patent in November of 2018 and gives it to his son to assist him in filing it, and then fraudulently conceals it from Mr. Alibod until 2022. There's no injury until this patent publishes. Now, in 2019 . . . But if the patent is invalid, there's no injury at all anyway. Other than the $500,000 he spent to invalidate the patent. Well, that's not the filing of the patent. In other words, the tort . . . The tort is the fraudulent concealment of this, because here's the next thing, 2019. There's bad blood after this, because the Aries is a hit, Josh wants 10% of the company, and he doesn't get it. So he storms off and secretly files this. In 2019, they're having a meeting with lawyers, and Mr. Alibod asks Mr. Clementi, do we have a patent? And he says, I do. So, didn't he say . . . again, it's important to say exactly, because there's a recording of that, or a transcript of that, and he says, have you filed a patent? He does, and he says, he has not. He personally has not, is what he says. Right, but he was asked if you personally had filed . . . now, you can say maybe you should have signed more, but he didn't say, do we have a patent, he said, have you filed a patent? Right, and he very cagedly answered, I have not filed a patent, but at that point, especially given the context, he's the president of the company, and he doesn't say that . . . but by the way, I've secretly helped my son to file a patent. And that may be . . . I mean, that and some of your pleadings may . . . there certainly can be a duty to speak by a fiduciary, and you can argue that, but you still have to overcome inquiry notice, even with that, correct? I think that's right, and the first time there's any inquiry notice is the publication of the patent, much later, in 2021. Why wasn't there not inquiry notice when, in that same meeting you're talking about, Tim says, Josh really is the inventor of all this, he has . . . it's all in his brain. Isn't that an indication that he thinks he's got ownership of that intellectual property? And he's making . . . I think that's right, and he's making the inquiry at that time about the patent, and Tim cagedly answers it. He can't hedge like that. He just can't. He has the duty at that time, it comes up, there's a patent pending, he has a duty even before that to tell him, but when the question is put to him, he's the president and fiduciary of the company, he has to tell him at that time, and then he lulls him. So there's no reason for Mr. Alibod to look anymore, there's no reason for a guy who's not a patent attorney to scour the patent office. So the next time there's . . . the first time there's any potential injury here is when the patent publishes, and it's not really until November of 2022 when the patent finally issues that there's any real damage here, because now there's a patent. I want to talk about the contract claim really quickly because it's been mischaracterized. We have a breach of contract claim, it's count one. It's based on a breach of Section 7D of the MIT Operating Agreement. That is a contractual claim. We styled it a fiduciary duty claim because they are contractual fiduciary duties. It's the way the LLC Act works in Delaware, and so we're into the Delaware statute of limitations, which is three years subject to equitable tolling, and there's no better reason to equitable tolling than Tim Clemente fraudulently concealing his participation in this and then being very cagey about how he answers it. And so Mr. Alibaba was not on notice of this until the patent issued. It's well within the three years of the statute of limitations here. And so those are the two big counts. We've belabored the breach of contract claim with Josh Clemente. He's unjustly enriched. He still has a patent with one claim, and it actually inhibits MIT's business. He can't put a ramp on the Ares because the prototype did not have a ramp, and so that last claim was not asserted. So he still has a patent. It's not moot at this point that he could assert against him. And so with that, I see my time is almost up, and I'll... You have some rebuttal. Yeah. Thank you, Your Honor. Okay. All right. Mr. Hanson. May it please the court. My name is Andrew Hanson. I'm here on behalf of the appellee, Tim Clemente. I'm joined here by my colleague, Rebecca LeGrand, who's here on behalf of the appellee, Josh Clemente, from whom you'll be hearing later. At the heart of this case is that MIT's majority owner, Fahmy Al-Abad, induced Josh Clemente to use his skills as an engineer to redesign the Ares, which is MIT's only product, based on an oral promise that in return, Josh would receive an equity stake in MIT. Now, in late 2017, when the Ares redesign proved highly successful, Mr. Al-Abad broke his promise and took Josh's work without compensation. So you're going to walk us through these claims? I mean, there were seven claims, two of them dismissed. It seems like there are five or so. And the main issue, at least for most of them, is the question of the statute of limitations. There's some question as to underlying to it. That would be helpful, I think, to us, if you would address them in that order so that we can understand... I would be very happy to do that, Your Honor. ...the posture of it. I would be very happy to do that. And allow me to take the business conspiracy claim first. And, as I do that, I'd like to correct the record. Judge Quattlebaum had a question regarding the underlying tort for the business conspiracy claim. And the underlying tort matters for the purpose of determining when the statute... You might do better to answer Judge Wynn's question and... Yes, Your Honor. And so, the statute, all I'm trying to say, Your Honor, is that the statute of limitation begins to run for a business conspiracy claim when the underlying tort experiences just enough injury sufficient for the plaintiff to bring a claim, a cause of action. And so, but here, in the pleadings... The period is three years? Sorry, Your Honor? The period is three years? For a business conspiracy claim, the period is five years. Five years? Okay. Yes, Your Honor. And there's no tolling in Virginia law for this business conspiracy claim. The underlying tort at issue here, in the pleadings, was a claim of misappropriation of confidential information and trade secrets. However, MIT has dismissed this trade secrets claim. It admitted it cannot prove it for the same reason that it can't prove the existence of any confidential information. In the proceedings below, this is at page 1158 of the joint appendix, MIT instead argued that it's the fraud claim that count five, which is the underlying tort. And as the court will be able to see, the tort claim at issue here all relates to conduct that occurred in 2017 or earlier. This is at page 41 and 42 of the joint appendix. You can see all these allegations are for significantly older conduct. And so, whether it's fraud or whether it's misappropriation of confidential information, the harm at issue here occurred at the very latest, at 2017, when MIT alleges that Josh received confidential information from Tim without the protection of an NDA or under the fraudulent guise that there was an NDA. Now, I'd like to note that we completely reject this characterization. In fact, this is Josh's work product. He was never compensated. He was never an employee of MIT. He was never a member of the LLC. And there's no contract. What about your colleague's response that, well, there was additional conduct in, I guess, 2018 that is independent and re-triggers the statute? Do you have a response to that? I do, Your Honor. So the issue, so MIT is now claiming that the conduct occurs at intervals. And I think it's important to note that the Virginia Supreme Court, the Supreme Court of Virginia has never recognized that misappropriation of confidential information is the kind of harm that it can incur at intervals. In fact, the very nature of a disclosure of confidential information is not susceptible to that sort of characterization. So this is... Wouldn't the point be if in 17, Josh has the confidential information without an NDA, that any additional publication, you know, isn't, I mean, maybe more harm, but the harm's already occurred and once you've lost your trade secret status, you know, it's not like, you know, you might argue filing the patent doesn't make any difference there. Exactly right, Your Honor. The genie's out of the bottle. You can't put it back in. Once something is disclosed without a protection, it's lost forever. You can't recreate a trade secret or recreate the confidentiality of something that is now in the public domain. And that is why, by its very nature, the allegation that is underlying the business conspiracy claim is simply not susceptible to a notion of the statute of limitations occurring at intervals or a harm occurring at intervals. And then, I mean, we're not trying to tell you what to do, but several times we've suggested going through each one and you might want to move on to another one and kind of. Yes, Your Honor. Statute issues. Yes, Your Honor. So that's the business conspiracy claim. And I'll turn now to the breach of fiduciary duty claim. So a breach of fiduciary duty under Delaware law. Is this count one? This is count one, Your Honor, yes. So you're calling it breach of fiduciary duty, he called it breach of contract. Yes, Your Honor. I'd like to just address that briefly, which is, you know, by its terms, it is identified as a breach of fiduciary duty claim. It's not a contract claim. And in fact, MIT asserted two other claims for breach of contract in the very same pleadings that count six and seven, in both cases giving them the label of breach of contract. And moreover, MIT distinguished in a claim for injunctive relief against him to seek to enjoin Tim for violating his contractual and fiduciary duties, which would seem like an unnecessary distinction if MIT only had ever sued him for breach of contract. What difference does that make? It has a substantial difference, both in the limitations period and in the preemption under the Delaware Uniform Trade Secrets Act. The preemption, I get that. So the Delaware courts have interpreted their own Uniform Trade Secrets Act as preempting all other tort theories based upon a theory of misappropriation of confidential information, regardless of whether the confidential information rises to the level of a trade secret. So the whole thing is preemptive. Can't you argue that even if it's contract, because it is referencing the operating agreement in some way, wouldn't you also argue that even under that approach, that it fails under the breach of contract statute of limitation? Absolutely right. So the tort contract, your success isn't dependent on us going with you on tort versus contract? Absolutely not. And so I think it is, so there's a three-year statute of limitations if it is a contract claim, which we contend is not. But MIT appears to acknowledge that its claim is untimely under the default statute of limitations because it's seeking to rely upon a tolling doctrine. So maybe I'm oversimplifying this, but you're dealing with a breach of fiduciary duty. Cut-off date, I think is agreed, is October 16, 2020, for years from the time it was filed. The question is, was it equitably tolled beyond that period of time? It seems to me perhaps the strongest, or at least strong evidence of it, might be that August 2019 meeting. Was that inquiry noticed at that time? I'd like to address that directly, Your Honor. So in this meeting, so this is, I think we should note a few things. Is there something stronger than that that you have, than that meeting? It seems like that meeting is very critical on this because that's the time at which, depending on how you look at it, it could have been he was cagey in terms of time to set up. But nonetheless, he revealed that Tim could have this agreement, or could have this patent. Seems like to me, that's very strong. So yes, so let me, I think we should first note that it's MIT's burden to prove that a tolling doctrine applies, and it only applies in rare and unusual circumstances. And this is the only, this is one comment and one conversation. That's the whole basis for their tolling argument. And I would also note that they've never argued equitable tolling in the courts below. We submit that it's not preserved for appeal. The only argument they've asserted is one of fraudulent concealment. But turning directly to Your Honor's question, the question by Mr. Alibod's attorney to Tim Clemente was, do you have any patents on this? Have you ever applied for any patents? And there's no dispute that Tim answered honestly. I, he said, I applied for a patent a few years ago, but I don't currently have any patents. So MIT is trying to fault Tim for not answering a question that he wasn't asked. And they have produced no case showing that such- Shouldn't he go on to say something more in terms of Tim's? Absolutely, Your Honor. He then- Focus, we can get the part about, okay, maybe he answered it honestly or whatever, but it seems to me it's what he said after that. That's pretty, pretty, pretty strong. I completely agree, Your Honor. In the same conversation, he told, he tells Mr. Alibod with his counsel there, repeatedly, that you don't own what Josh created. And he urged him to compensate Josh so that MIT could acquire the rights to the product that it was selling. So if- Go ahead and finish that, I'm sorry. Well, I mean, in this conversation, Mr. Alibod had no reasonable basis for thinking that Tim, in the exercise of his duty as MIT's president, would be protecting an asset that he didn't believe that MIT owned. And he had no reasonable basis for believing that MIT did own it. Tim was never- Can I follow? Yes, Your Honor. Is, does the, do the multiple times that Mr. Alibod asked about the nondisclosure and was told, allegedly, that, yeah, I think he signed it, but he can't find it, I mean, does that go into inquiry notice as well? It seems to me, if you know someone is, has access to confidential information, and, you know, and you're, you know, being told that, yeah, he signed and can't find an agreement, and you don't ask to sign another one, that, I want, does that go into inquiry notice? I absolutely believe it does, Your Honor. I think it goes into inquiry notice for the purpose of restarting the limitations period, even if a tolling doctrine did apply, which is unlikely. But moreover, I think it's the same for the common law fraud claim, which is count five. That has a two-year statute of limitations that runs from the period in which, with the exercise of reasonable diligence, the plaintiff should have known about the fraud. And so here, I mean, there's really an equivalence here between inquiry notice and reasonable diligence. And so, yes, when, and as we, as I noted previously, the fraud claim is replete with references exclusively to being about inducing MIT to allow Josh to work without the presence of a nondisclosure agreement. And the record reflects repeated requests by Mr. Alibod to Tim for where is this nondisclosure agreement? Where is this nondisclosure agreement? And Mr. Alibod explained that as of this, as of the sort of dispute that happened in late 2017, he began to immediately ask for the NDA. And now he asserts that there never was an NDA. So yes, that is absolutely relevant to the question of inquiry notice and is relevant to the question of reasonable diligence. You know, there, and I would also add that the NDA in question was for an entirely different entity, Atlantis Consultants. That's the NDA that has been at issue in this whole case. And there's no dispute that the NDA would not have protected MIT, even if it had been signed. So this, I mean, it is. Tim seemed to think so. Tim was mistaken, but yes, I mean, he was, Mr. Alibod asked him, before the creation of MIT in August of 2013, Mr. Alibod asked him, you know, get Josh to sign this NDA. And that, and so he, when he was repeatedly asked after the fact if that had occurred, that's what he was referencing. He was referencing the Atlantis Consultants NDA. He acted as if the, what is it called, the, well, who's the company, Atlantis, the Atlantis NDA would have applied to the other, maybe legally that's incorrect, but he acted as if that would have satisfied his obligations. I think he was, he communicated that he thought that the NDA had been signed, but he was mistaken. But so, you know, turning to the, to the issue of constructive notice, which is another basis in which the limitations period would run, even if a tolling of doctrine applies, constructive notice can give rise to inquiry notice that would restart the limitations period for breach of fiduciary duty as well. And here they were putting patent pending on the product. And so when you look at the facts of Tim Clemente telling Mr. Alibod in the presence of his attorney that MIT didn't own Josh's work, and that Josh needed to be compensated in order to, for MIT to own the product. And then Mr. Alibod knowing that NDA was missing despite his repeated requests for it, and Mr. Alibod himself putting patent pending on the product marketing brochures, even long after Tim Clemente's July 2017 provisional patent had expired. You know, this is, this is something I'd like to address in MIT's brief, where they reference that, they claim that all of the patent pending references occurred in 2017. That's just not true. You can see in the record, there is a reference to, in November of 2018, November 2nd, 2018, Mr. Alibod emailed Tim Clemente, and with a revised marketing brochure, where that same patent pending is listed on the product. This is at pages 656 through 666 of the joint appendix. So maybe I'm not understanding. Why does that, why does patent pending on the brochures go to inquiry notice? Well, I think sort of in the panoply of facts here, where it certainly shows that the notion of patent, of whether the existence of a patent was contemplated. And they had reason to think about, particularly where Mr. Alibod is receiving information that he doesn't, that MIT doesn't own Josh's work, and that he can't get an NDA. And there, and the notion of patent was certainly in the mix when it's referenced on these brochures. I think that certainly goes to, goes collectively to the notion of constructive notice. All right. I think your time's up. Thank you, Your Honor. Yeah. All right. I guess we'll hear from Ms. Legrand. Thank you. May it please the court. My name is Rebecca Legrand, and I'm here on behalf of the appellee, Joshua Clemente. I'd like to start with an observation and then just make two quick points. My observation is that the district court granted summary judgment quickly and efficiently. You want to stay close to your speaker here? Thank you. The district court granted summary judgment quickly and efficiently on essentially all of the appellee's claims, because these are straightforward issues. And I'll make two points here. I'll start where the district court started, with the statute of limitations. It is not a difficult conclusion here to find that all of the claims at issue are untimely. As has already been referenced, the complaints- But only certain of these accounts apply to your client. Correct. And I can speak on- Which counts are those? Count four? The first count that applies to my client is the business conspiracy count. Then there's an unjust enrichment count, which is count four. And then the breach of contract count, which is still here, and is count six. So those are the three counts that are alive and exist again, or well- And which of those are you addressing first? So I was, in part because I have only three minutes and 48 seconds, I was making a broad point that I think for all of those claims, it isn't hard to see that they're stale. It isn't hard to see that key events happened more than five years ago, which means the statute of limitations for either, for any plausible claim has expired. Because 2017 is before the statute of any claim brought after October 2018 is stale under a five-year statute of limitations. And the focus by the appellant here today on what they believe was unfair things that were done in 2017, claims accrued no later than then. And under any plausibly applicable statute of limitations, be it five years or three years, those claims are stale. And I think that's why the district court reached that conclusion quickly. And then pivot to a second point, which is sort of related. The trickiest thing in responding to appellant's statute of limitations argument has been, they frequently say, well, we couldn't bring a claim yet because we weren't damaged. Because they can't get around the fact that they knew that they were fighting, essentially, starting already in 2017, more than five years before they brought a claim. So their only explanation for why these claims aren't stale is, well, we weren't damaged yet. But as my colleague already pointed at, the law does not permit that. Any injury, no matter how minor, starts the clock ticking for the statute of limitations. And in claims that involve alleged use or possession of confidential information that allegedly someone shouldn't have, the harm happens when that person gets the information. Not when they monetize it, not when they patent it, when they get it. And the allegations that- When did Josh start working on ARIES II? 2017, Your Honor. Early 2017. So, in early 2017, Josh is developing know-how and technology and connection with the device. And everybody knows he's doing it. And he's not an employee, he's an independent worker. And the relationship has not been solidified with him, between MIT and him, and he's got this information. So, the argument that MIT seems to be making is that it somehow is entitled to that information because it hired him, even though they don't pay him. Or, I don't know what the claim is, but in the big picture, we're talking about technology and the loss of technology, or who owns the technology, and it's just very poorly documented and followed through. The best would be that if he, in 2017, signed an NDA, then MIT might have some claims. But the question is, if he's working as an independent contractor for MIT, although even that is not well established, it's a funny relationship. But the fight is over technology being developed in 2017, about which everybody had knowledge, right? Correct, Your Honor. And so, because Josh was not an employee, because Josh had never signed an agreement with MIT, the only argument that MIT could plausibly have to ownership of this patent would be based on there being an additional inventor. But that would be a claim about inventorship that would need to be brought under the patent law, the Patent Act. Federal preemption is strong in the area of patent law. What do you understand to be MIT's claim to any of this technology? I will do my best. The basis for it. The claim that they somehow own the technology. Honestly, Your Honor, it has shifted, but let me do my best on their behalf. I think the best argument, the argument they've made most recently, I think, is if Tim had been named as an inventor too, because Tim was a member, then there would have been some ownership rights. But Tim was not the inventor, Joshua Clemente was the inventor. And if a dispute about inventorship must be brought through the Federal Patent Act, not through common law conspiracy claims or unjust enrichment claims, because it turns specifically on inventorship, which is at the heart of the Patent Act, and preempted as a result. There's no argument that there was a contractual right for MIT to have an ownership stake in Joshua Clemente's invention. It is true that Joshua Clemente had hoped that that was what was going to happen. He did indeed. They'd had numerous discussions. In fact, Joshua Clemente had been promised that he would get an ownership stake in the company eventually. And that's what he wanted. And he's working with his father, who was the president of the company. So, yeah, people were working on trust a little bit here, because it's family. Unfortunately, the majority owner. Well, it sounds to me they were working on anticipation of some relationship that never consummated. Correct. And MIT took the risk that there would be no agreement. And there wasn't. There were certainly plenty of opportunities for them to reach an agreement, including, and this is in the record, and the judge noted it. because it's in discovery, it's in documents that were- Thank you, I think your time is up. Thank you. All right, Mr. Mills. Maybe I'll ask you that question, too, is here in 2017, Josh is working on this device and and clearly, Tim is telling MIT that he's the inventor of this device. What is the claim of any ownership in what Josh did by- What's the basis for MIT's claiming any ownership in what Josh did? Here's what happened in 2017. Mr. Alibod spent a million dollars hiring Cardinal Scientific to develop a working prototype of the Ares and demonstrated it at his facility in Waldorf, Maryland. He hired- But that doesn't give him the right to the thing. The question is, he was relying on the fact that Josh somehow would be in a relationship with MIT. I mean, if Josh was the inventor, the fact that somebody else later built it doesn't mean that that person who built it becomes the inventor. I think that's correct, but that's, this is, and you accurately say this is poorly documented and messy, and I agree with that, but I'm, this is a fight about ownership of inventive rights, of technology. And confidential information, and what- Well, the confidential information is only confidential if it is confidential. I mean, it was known by Josh. Josh was not connected with the company. Well, here's what happened. They paid Cardinal Scientific to develop computer-aided design files, and Josh signed, as the VP of engineering of MIT, a contract with 21st Century to develop the software, the source code for the wireless controller, and then he kept it. Okay, that was information paid for by MIT, signed for by Josh. That was in 21, though, right? No, that's in 2017. Okay, so- That's in 2017, and he didn't give it back. That was one of the reasons. We abandoned our trade secret claim, but we still have a confidential information claim. But one thing I would like to clear up, committing a wrongful act outside the statute of limitations does not provide defendants with carte blanche to commit new wrongful acts within the statute of limitations. That's not the law of Virginia or Delaware or anywhere else, and that's exactly what happened here. Okay, and so the argument that some kind of a continuous tort is just wrong. These are new independent acts with new injuries, and there was an inquiry. That August 19th meeting is really important. I don't quite understand that, because the technology was being developed to everybody's knowledge in 2017. And Josh was a big player in that, and Josh was trying to protect his creative interest in it. He had no legal relationship with MIT. He anticipated it and requested it. And the two had these exchanges about the NDA and about getting a share and being paid. The fact that there's later efforts to shore that up or something doesn't change the statute of limitations. It seems to me if you wanted that technology protected, you have knowledge of its unprotection in 2017. I don't think that's right. He's working under the direction and supervision of his father, whose duty, I see my time is up. May I answer your question? Yeah, okay. May I answer your question? Go ahead and just finish. Yeah, he's working under the direction and supervision of his father, whose duty it is to protect the information. His father had testified that he thought he was under the NDA. But his father has a duty to protect. His father doesn't have the information that, I mean, the information that is being developed at that point is being developed by Josh. And his father knows about it, but so does, what's his name, Alaba? It's being developed by Cardinal Scientific, by 21st Century, by Timothy Clementi, in addition. Thank you, Your Honor. Thank you. We'll come down and greet counsel and then proceed on to the next case.
judges: Paul V. Niemeyer, James Andrew Wynn, A. Marvin Quattlebaum Jr.